IN THE UNITED STATES COURT OF FEDERAL CLAIMS

*Electronically Filed on October 5, 2017*

| | | |
|---|---|---|
| ANGELA BOUZERAND, WAYNE PESEK, AMY PESEK, AND FRED PAUL FRENGER, *individually and on behalf of all other persons similarly situated*, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 17-1195 L |
| v. | ) ) | Judge Victor J. Wolski |
| UNITED STATES, | ) ) | |
| Defendant. | ) ) | |

**DEFENDANT'S STATEMENT AND
PROPOSAL FOR PRELIMINARY PROCEEDINGS**

As set forth in various complaints filed in this Court—on August 25, 2017, Hurricane Harvey, a powerful Category 4 hurricane, made landfall in Texas. President Trump declared areas affected by Hurricane Harvey a disaster area that same day. Over the next several days, this catastrophic storm lingered and proceeded to dump record amounts of rain in the greater Houston area. Some rainfall totals in Houston exceeded 50 inches. The storm has been described as a 1000-year event.[1]

In the 1940s, pursuant to the Flood Control Act, the United States Army Corps of Engineers constructed two earthen flood-control dams (the Addicks and Barker dams) to reduce the risk of flooding in the City of Houston. The volume of rainfall from Hurricane Harvey

---

[1] This brief summary is based on preliminary information and allegations contained in the respective complaints. The United States is continuing to research the facts relating to these cases and will answer the respective complaints in accordance with the Court rules, and as set forth below.

1

caused the reservoirs behind these flood-control dams to rapidly reach their capacity and controlled releases of water ensued.

Over the past month, the United States has received complaints in more than twemty-five cases alleging that flooding resulting from Hurricane Harvey constitutes a taking of private property by the United States under the Fifth Amendment.  These cases assert both that the water released from the Addicks and Barker reservoirs caused flooding and thus effected a taking of downstream properties (*i.e.*, properties below the dams along Buffalo Bayou), and that the Government's failure to release more water sooner effected a taking of upstream properties (*i.e.*, properties above the dams around the flood-control reservoirs).  The complaints in their totality suggest that the Corps was placed in an impossible position by Hurricane Harvey because there was simply too much water.  The United States respectfully disputes Plaintiffs' various taking claims.

## I.       **LEGAL BACKGROUND**

The Supreme Court has held that the character of a singular flooding event should be dispositive; a single flood – as opposed to an inevitably recurring flooding caused by the Government – is not a taking as a matter of law.  *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 37-40 (2012) (quoting with approval *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327, 329-30 (1922) ("While a single act may not be enough, a continuance of them in sufficient number and for a sufficient time may prove a taking." (alterations omitted))); *see also Stover v. United States*, 332 F.2d 204, 206 (9th Cir. 1964) ("An isolated injury is not considered a taking.").  However, even if the extraordinary rainfall and resultant flooding caused by Hurricane Harvey were not deemed a singular event, individualized analysis of each claim would be necessary under *Arkansas Game*.

In *Arkansas Game & Fish Commission v. United States*, the Supreme Court rejected the notion "that flooding cases should be set apart from the mine run of takings claims." 568 U.S. at 35. The Court noted that it had previously "distinguished *permanent* physical occupations from *temporary* invasions of property, expressly including flooding cases, and said that 'temporary limitations are subject to a more complex balancing process to determine whether they are a taking.'" *Id.* at 36 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982)) (emphasis added). Therefore, the Court concluded, "[t]here is thus no solid grounding in precedent for setting flooding apart from all other government intrusions on property." *Id.*

The considerations mentioned in *Arkansas Game* as relevant to a temporary physical takings claim analysis include: (1) duration of the physical invasion or interference, (2) "the degree to which the invasion is intended or is the foreseeable result of authorized government action," (3) "the character of the land at issue and the owner's reasonable investment-backed expectations regarding the land's use," and (4) "[s]everity of the interference." *Ark. Game*, 133 568 U.S. at 39 (internal quotation marks omitted). These factors, which the Court did not treat as exclusive, are akin to the "complex of factors" enunciated in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), which include the character of the government action, interference with investment-backed expectations, and economic impact. *See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 315 n.10 (2002) (quotation marks and citation omitted). The property-specific nature of the legal analysis required by *Arkansas Game* has significant implications for the procedure that the Court should adopt in these cases.

## II.  PROPOSED PROCEDURE

The United States appreciates the Courts' scheduling of an early hearing to develop an orderly process for handling these cases.[2] The Rules of the United States Court of Federal Claims ("RCFC") provide the basic elements for an orderly process for case management. Because of the large number of cases filed to date, the complexities of coordinating multiple cases seeking class certification, and the number of claims likely to ultimately be before the Court, the United States believes that implementing a coordinated process for handling Hurricane Harvey takings cases is essential.

The United States considers it to be premature to address definitively some of the questions posed by the Court in Order Scheduling Status Conference (ECF No. 6), which require a full understanding of the universe of Plaintiffs and the allegations in any amended complaints. The United States proposes that the Court immediately take two steps. First, the Court should establish a single schedule in all currently-filed cases to address preliminary matters. Preliminary matters include the amendment of complaints (already requested informally by several plaintiffs) and the prompt resolution of requests for class certification (sought in at least nine currently-filed complaints). Second, to facilitate the orderly resolution of pending cases, the Court should direct that new cases, *i.e.*, those not filed before the October 6 hearing, be stayed, with the exception of addressing requests for class certification according to the same schedule set forth below. The advisability of continuing that stay should be revisited after the preliminary issues, addressed below, are fully resolved.

---

[2] Since the Court scheduled this hearing, the total number of takings cases arising out of the Corps' alleged conduct has risen to twenty-nine.

The United States respectfully proposes that the Court adopt the following schedule in all currently-pending cases:

| Event | Date |
|---|---|
| **Finalize Pleadings** | |
| Plaintiffs File Amended Complaints | November 15, 2017 |
| United States Files its Response to the Operative Complaints | January 15, 2017 |
| **Resolve Class Certification** | |
| Plaintiffs Identify Liaison Counsel | On or before November 20, 2017 |
| Plaintiffs File Their Motion(s) Seeking Class Certification[3] | January 15, 2018 |
| **Implement Coordinated Discovery** | |
| The Parties File a Joint Preliminary Status Report (including the parties' proposal for consolidating and coordinating discovery) | Thirty (30) days after the Court either denies class certification or the period for opting into the certified class closes |

The United States believes it is imperative to implement an orderly process that finalizes pleadings and identifies the plaintiff(s) asserting claims in each case before discovery commences. Numerous complaints seek certification of a class. Because the Court of Federal Claims Rules does not recognize or authorize "opt-out" class actions, *see* RCFC 23, Rules

---

[3] There are at present nine different class action complaints. Some attorneys for Plaintiffs have indicated an intent to consolidate their respective class action complaints. The United States has no way of knowing at this juncture whether those efforts will be successful, how many requests for class certification will be made, or the arguments that will be offered to support such motions. The United States will review the class certification request(s), when filed, and will then propose a specific period for responding, including whether discovery will be needed to address allegations made by Plaintiffs in support of class certification. The United States anticipates that it will need more time than is provided by the default briefing schedule in the RCFC.

Committee Notes, 2002 Revision, this means that if a class were certified, which the United States anticipates opposing, a reasonable period for class members to opt in would be necessary.

Moreover, irrespective of class certification, the United States will ultimately need property- and plaintiff-specific discovery to address issues relevant to liability, such as reasonable investment-backed expectations, the character of the plaintiffs' land, causation, and severity of the impact (*i.e.*, economic impact).  The United States cannot undertake discovery until amended complaints are filed, class certification issues are resolved, and the plaintiffs actually before the Court in each actions are determined.  At that point, through the Joint Preliminary Status Report process, the parties can address specific proposals to streamline discovery, using the sample case orders and organizational guidelines that the Court has provided to the parties.

Dated:  October 5, 2017

        Respectfully submitted,

        JEFFREY H. WOOD
        Acting Assistant Attorney General
        United States Department of Justice
        Environment & Natural Resources Division

        <u>s/ Kristine S. Tardiff for Jacqueline C. Brown</u>
        JACQUELINE C. BROWN
        United States Department of Justice
        Environment & Natural Resources Division
        Natural Resources Section
        601 D Street, NW
        Washington, DC 20004
        Tel: (202) 305-0481
        Fax: (202) 305-0506
        E-mail:  jacqueline.c.brown@usdoj.gov

        *Counsel of Record for Defendant United States*